ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL VI

| | | |
|---|---|---|
| CRYSTAL AMADOR FUXENCH Y OTROS<br><br>Apelados<br><br>v.<br><br>DEPARTAMENTO DE RECREACIÓN Y DEPORTES Y OTROS<br><br>Apelantes | KLAN202400086 | *Apelación* procedente del Tribunal de Primera Instancia, Sala de Bayamón<br><br>Civil Núm.: BY2020CV03148<br><br>Sobre: Daños y otros |

Panel integrado por su presidenta, la Jueza Ortiz Flores, el Juez Rivera Torres, la Jueza Rivera Pérez y el Juez Campos Pérez

Campos Pérez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 30 de abril de 2024.

Comparece la parte demandada y apelante, el Gobierno de Puerto Rico (Estado), por conducto de la Oficina del Procurador General, y nos solicita la revocación de la *Sentencia* emitida el 3 de noviembre de 2023, notificada el día 7 siguiente, por el Tribunal de Primera Instancia, Sala de Bayamón (TPI). En el aludido dictamen, el TPI declaró con lugar la *Demanda Enmendada* instada por la parte demandante y apelada y la *Demanda de Intervención* incoada por los Ciudadanos del Karso, Inc. (CDK). En consecuencia, concedió los remedios peticionados, a saber: declaró la nulidad de los acuerdos interagenciales entre el DRD y el DRNA, en cuanto al Parque Luis Enrique Monagas (Parque Monagas). Además, emitió un *injunction* permanente para prohibir al DRD y DRNA remover material vegetativo, cortar árboles en el Parque Monagas, bajo los acuerdos interagenciales anulados. Del mismo modo, emitió *injunction* permanente para ordenar al Estado a realizar un nuevo plan de mitigación, cónsono con la legislación y reglamentación ambiental, por los trabajos ya realizados en el Parque Monagas. A su vez, mandató al Estado a preparar una Declaración de Impacto

Ambiental (DIA), cuando fuera a realizar trabajos de corte y poda de árboles en el Parque Monagas.

Anticipamos la revocación de la determinación judicial apelada.

**I.**

La presente causa se inició el 8 de octubre de 2020, ocasión en que la parte demandante, conformada por Luis R. Lassus Burset, Tierra K-Ribe LLC, Jorge A. Lassus Burset, Yamil Pedraza Álamo, Carlos M. De León Rodríguez, Ricardo A. Mercado Concepción, Mario Velázquez Fernández, Mónica Lozano Pagán, Antonio Bulnes Galán, Simara Laboy López, Jean M. Lassus Burset, Yessenis Ríos Nieves, Jarrett Parker, Edwin Omar Ortiz González, Roberto García Inclán, Andrea Méndez Alzamora, César Garófalo Contreras, Manuel A. Vélez Reyes, Yazmín Salgado Beyley, Bryan Huffman Faure y Crystal Amador Fuxench, presentó una *Demanda* sobre sentencia declaratoria, interdicto preliminar y permanente, en contra de la parte demandada, Departamento de Recreación y Deportes (DRD), Departamento de Recursos Naturales y Ambientales (DRNA), sus respectivos secretarios en su capacidad oficial, DebrisTech (DT), DRC Emergency Services, LLC (DRC) y Quantum Consulting Group, LLC (QCG).[1] En esencia, los demandantes denunciaron una poda indiscriminada de árboles y palmeras en el Parque Monagas, que forma parte del Sistema de Parques Nacionales,[2] sito en el Municipio de Bayamón y administrado por el DRD. Los reclamantes, quienes utilizan y se benefician de la flora y fauna del Parque Monagas, expusieron que, conforme con un acuerdo interagencial entre el DRD y el DRNA (2021-000022),[3] el primero contrató a DT y a DRC

---

[1] Apéndice del recurso, págs. 1–16; 70–85, *Demanda Enmendada*, para adicionar a Quantum Consulting Group, LLC, al Departamento de Justicia y al Municipio de Bayamón; 283–431, *Demanda Enmendada*.
[2] 15 LPRA sec. 842 (i).
[3] Apéndice del recurso, págs. 219–223, 224–226: *Acuerdo interagencial para agilizar los trabajos de recogido y limpieza de escombros y rehabilitación de los*

para labores de remoción de escombros como resultado del Huracán María. Sin embargo, en alegada violación a los requisitos estatuidos, DT y DRC realizaron una tala indiscriminada de cientos de árboles y palmeras de distintas especies, tamaños y condiciones óptimas, sin la existencia de permisos para ello ni de un plan de mitigación. Añadieron que en el Parque Monagas convergían especies de flora y fauna en peligro de extinción, como el palo de rosa y la boa puertorriqueña, protegidos por el *Endangered Species Act* de 1973. El estatuto federal prohíbe la modificación de los hábitats naturales críticos esenciales de especies vulnerables o en peligro de extinción. Solicitaron el decreto de que la actuación de los demandados estaba vedada por el ordenamiento legal y atentaba contra la disposición constitucional que mandata la conservación del medio ambiente y los recursos naturales. A esos efectos, sostuvieron que procedía la paralización inmediata de la deforestación y peticionaron que se ordenara una reforestación ordenada y completa del área impactada.

El 16 de noviembre de 2020, la entidad CDK solicitó intervenir en el pleito, toda vez que el Parque Monagas forma parte del sistema de formaciones geológicas de la región del carso en Puerto Rico.[4] Adujo que, en contravención a leyes estatales y federales, los contratistas del Estado talaron cientos de árboles saludables de distintas especies y tamaños, sin aviso alguno y sin haber realizado un estudio científico previo para minimizar el impacto a la flora y a la fauna del Parque Monagas. En particular, mencionó que ninguna de las agencias concernidas mostró la existencia de aviso o autorización ni un permiso para corte, poda, trasplante y siembra de árboles. Alegó que la razón para llevar a cabo la tala de árboles

---

*parques nacionales del Gobierno de Puerto Rico* de 5 de agosto de 2020 y Enmienda A de 18 de septiembre de 2020.

[4] Apéndice del recurso, págs. 265–280. La intervención fue aprobada mediante la *Orden* de 7 de diciembre de 2020, notificada al día siguiente. Véase, Apéndice del recurso, págs. 2,814–2,815.

de forma apresurada y en violación al ordenamiento jurídico fue porque al DRD se le estaba agotando el tiempo para acceder a unos fondos del Federal Emergency Management Agency (FEMA). El reembolso de dinero por FEMA, en parte, estaba ligado a la cantidad de material vegetativo recogido. Por tanto, CDK solicitó al TPI que paralizara la deforestación, declarara la nulidad del acuerdo interagencial y la ilegalidad de las actuaciones descritas.

El 9 de diciembre de 2020, el Fideicomiso de Conservación de Puerto Rico y Para la Naturaleza, Inc. (Fideicomiso) peticionó la intervención o su participación como amigo de la corte.[5] Explicó que la poda indiscriminada de árboles tenía un impacto ambiental nocivo que aceleraba los efectos negativos del cambio climático en Puerto Rico lo que, a su vez, imposibilitaba que el Fideicomiso pudiera cumplir su mandato legal de conservación de las diversas áreas naturales protegidas. A su vez, indicó que tenía un deber de señalar las deficiencias constitucionales del acuerdo interagencial, al amparo del cual se realizó la poda de árboles. Apuntó que la tala indiscriminada de árboles en el Parque Monagas, a base del aludido acuerdo, contradecía la política pública de conservación del ambiente, las leyes ambientales aplicables a este tipo de práctica, la ley orgánica del DRNA y los propios reglamentos promulgados por la agencia.

En representación de ambas agencias, el Estado instó sendas contestaciones, *Contestación a Demanda Enmendada* y *Contestación a Demanda de Intervención*.[6] En general, negó todo enunciado de opinión, conclusión y planteamiento de derecho, por estar sujeto a ser dirimido por el TPI. Por igual, estableció que las aseveraciones en torno al contenido del acuerdo interagencial —en esa etapa, un

---

[5] Apéndice del recurso, págs. 2,818–2,831. La intervención fue aprobada mediante la *Orden* emitida y notificada de 14 de diciembre de 2020. Véase, Apéndice del recurso, págs. 2,895–2,896.
[6] Apéndice del recurso, págs. 3,208–3,225; 3,226–3,236.

documento estipulado por las partes— estaban sujetas a ser evaluadas e interpretadas en su totalidad por el TPI. Entre las defensas afirmativas, formuló la doctrina de agotamiento de remedios, defendió el proceder legal, de buena fe y dentro del marco de las funciones delegadas a las agencias y resaltó que la parte demandante tenía el peso probatorio de sus alegaciones.

En sus alegaciones responsivas,[7] DRC negó las alegaciones por constituir aseveraciones u opiniones en torno a un documento del cual no fue parte. También descansó sus negaciones al sostener que las alegaciones constituían planteamientos o conclusiones infundadas, especulativas y basadas en percepciones, opiniones o aseveraciones incorrectas, que serían objeto de prueba en su día. Como defensas afirmativas, planteó que, en todo momento, actuó conforme con los contratos de trabajo y documentos suscritos con los otros demandados y en cumplimiento con los procedimientos y requisitos aplicables.

Por su parte, en sus respectivas contestaciones,[8] DT reconoció la existencia del acuerdo interagencial, del cual acotó que hablaba por sí solo. Admitió que fue contratado por el DRD para realizar trabajos de monitoreo y documentación relacionados con el recogido de escombros en el Parque Monagas, no para la tala o poda de árboles. Afirmó que las actividades no buscaban proteger los árboles ni la zona cárstica, sino la vida y propiedad de los usuarios del Parque Monagas, puesto que su objetivo era remover escombros que impidieran el uso seguro de las veredas del área y mitigar el riesgo de daño, en caso de ocurrir un evento previsible en el futuro.

Luego de un sinnúmero de trámites interlocutorios, innecesarios de particularizar a la luz de los señalamientos de error

---

[7] Apéndice del recurso, págs. 3,243–3,260; 3,275–3,284.
[8] Apéndice del recurso, págs. 3,261–3,267. Véase, *Contestación a la Demanda Enmendada,* entrada 123 en el Sistema Unificado de Manejo y Administración de casos (SUMAC).

planteados, el 26 de marzo de 2021, el Estado presentó una *Moción de Desestimación,*[9] a la que DT y DRC se unieron.[10] Alegó, en síntesis, que el DRC y el DRNA suscribieron un nuevo acuerdo interagencial (2021-000150),[11] así como que ambos entes gubernamentales determinaron finalizar los trabajos de poda y corte de árboles en el Parque Monagas. Concluyeron que las enmiendas adoptadas, en particular en el proceso de reglamentación y permisos, tornó las controversias en académicas.

La parte demandante se opuso a la desestimación.[12] Adujo que, a base del cambio de estrategia de las agencias y el testimonio de las partes,[13] la controversia era recurrente y susceptible de repetición. CDK se opuso también.[14] Rechazó la academicidad de la controversia y sus visos de permanencia, ya que los entes gubernamentales tenían un historial de incumplimiento con el ordenamiento legal ambiental. Añadió que la identificación de los trabajos de remoción de material vegetativo como uno de "exclusión categórica" eximía al DRC de su obligación de realizar una DIA en el Parque Monagas, en violación a los mandatos legales que los rigen. Ello así por estar involucrados especies en peligro de extinción, como la boa de Puerto Rico y el palo de rosa.

El Estado replicó e insistió que la solicitud de detención de la poda y la tala indiscriminada era un asunto académico.[15]

En atención a los escritos, el 8 de mayo de 2021, el TPI notificó una *Resolución,* mediante la cual, entre otros pronunciamientos,

---

[9] Apéndice del recurso, págs. 3,329–3,335.
[10] Apéndice del recurso, págs. 3,336–3,345 y 3,346–3,350.
[11] El Estado no unió el Anejo que acompañó la moción desestimatoria: *Acuerdo interagencial para agilizar los trabajos de recogido y limpieza de escombros y rehabilitación áreas verdes de los parques nacionales y recreativos bajo la administración del Departamento de Recreación y Deportes del Gobierno de Puerto Rico* de 5 de marzo de 2021. Véase, Anejo I de la *Moción informativa para elevar documento* de 31 de enero de 2024 o el de la entrada 153 SUMAC.
[12] Apéndice del recurso, págs. 3,379–3,411.
[13] Véase, *Minutas* de 3 y 10 de febrero de 2021, Apéndice, págs. 3,237–3,242; 3,362–3,372; 3,373–3,378.
[14] Apéndice del recurso, págs. 3,412–3,429.
[15] Apéndice del recurso, págs. 3,432–3,439.

declaró no ha lugar la petición desestimatoria del Estado por academicidad.[16]

Así las cosas, el pleito continuó.[17] Luego de examinada amplia prueba documental, pericial y testifical que mereció la credibilidad al TPI, el caso quedó sometido el 7 de junio de 2021.[18] No obstante, no fue hasta el 7 de noviembre de 2023, que se notificó la *Sentencia* apelada.[19] En su dictamen, el TPI consignó determinaciones de hecho que establecen, en resumen, que el Parque Monagas, clasificado como un "bosque crítico" por el United States Fish and Wildlife Service, se encuentra en la Zona del Carso Norte de Puerto Rico y cuenta con una vegetación diversa. La zona del carso es de alto valor ecológico, una fuente importante para los abastos de agua y muy vulnerable ante la intervención humana. Debido a las condiciones geológicas del carso, el crecimiento de la flora, especialmente de árboles, es lento.

Con el paso del Huracán María el 20 de septiembre de 2017, la vegetación del Parque Monagas fue severamente afectada y sus veredas se llenaron de escombros. Inicialmente, con la anuencia del DRD, miembros de la comunidad de manera voluntaria realizaron trabajos de recogido. Así, pues, la *Sentencia* aseveró que, con el paso de tres años, la vegetación del Parque Monagas se recuperó de forma gradual y natural. El TPI fue enfático al enunciar que no había emergencia alguna cuando el Estado y las compañías contratadas iniciaron los trabajos objeto de la controversia.

El 14 de febrero de 2020, el DRD y el DRNA firmaron un acuerdo interagencial mediante el cual el DRNA le otorgó facultades al DRD para agilizar los trabajos de recogido y limpieza de escombros y rehabilitación de los parques nacionales de Puerto

---

[16] Apéndice del recurso, págs. 3,456–3,466.
[17] Véase, *Minutas* de 14 de abril y 11 de mayo de 2021, Apéndice del recurso, págs. 3,476–3,481; 3,482–3,489.
[18] Véase, *Orden* de 24 de mayo de 2021, entrada 185 SUMAC.
[19] Apéndice del recurso, págs. 3,682–3,730.

Rico. El acuerdo eximió al DRD de presentar una solicitud de permiso para corte, poda, trasplante y siembra de árboles. En particular, en el sexto inciso del acuerdo se expresó que "el DRD solicita al DRNA un procedimiento especial tomando en cuenta que los impactos ambientales de dichos trabajos serán mínimos y los mismos cualifican como exclusiones categóricas…". La razón dada en el documento para tal exclusión fue que existía una situación de emergencia, a pesar de que la vegetación del Parque Monagas para ese entonces ya se había recuperado significativamente y no existía peligro para la vida ni la propiedad. Ahora, el TPI determinó probado que el DRD nunca solicitó o presentó algún documento para peticionar la exclusión categórica al DRNA con el fin de efectuar las tareas en el Parque Monagas. El personal utilizado para la tala y poda de árboles en el Parque Monagas no tenía la experiencia ni la preparación o certificaciones necesarias para realizar la tarea en áreas ecológicamente sensibles. Esto incluyó el desconocimiento del manejo de especies en peligro de extinción. Más bien, su conocimiento se limitaba a daños por desastres naturales en zonas urbanizadas y carreteras.

En la ejecución de los trabajos, un hecho determinado estableció que las compañías contratadas, DT, DRC y QCG, sólo recorrieron el 50% del Parque Monagas para su evaluación; caminaron solamente por algunas veredas y facilidades recreativas. Luego de este recorrido, estimaron el número de árboles "dañados" que debían cortarse o podarse por las veredas que recorrieron, multiplicaron este número por dos y así llegaron a la cifra en el inventario de 8,000 árboles para ser cortados y 4,000 para ser podados, como cifra estimada para los trabajos. Por tanto, no hubo guías claras para determinar si un árbol requería o no tala o poda. La persona que hacía el examen determinaba la acción a tomar solamente mediante observación. Incluso, el personal del DRNA

desconocía la razón de la tala o corte del árbol. Como resultado, se cortaron árboles saludables o de manera incorrecta, no se evaluó el impacto del corte y poda ni de la introducción de maquinaria pesada en el área. Tampoco se tomó en cuenta las especies de flora y fauna en peligro de extinción, como el palo de rosa y la boa puertorriqueña, respectivamente. Cabe señalar que el reembolso de dinero que entregaría FEMA dependía, en parte, de la cantidad de material vegetativo que se recogiera, ya que se pagaba por yarda recogida. No fue hasta la presentación de la reclamación civil de autos, que los trabajos se paralizaron de manera voluntaria. Además, el DRNA y el DRD informaron que las labores de manejo, tala y poda de árboles en áreas verdes, caminos y veredas en el Parque Monagas no se reanudarían, por lo que se dieron por terminadas. En el Parque Monagas, se cortaron aproximadamente 1,868 árboles; y se podaron aproximadamente 64 árboles.

De otro lado, la *Sentencia* recoge que el DRD y el Municipio de Bayamón, a mediados de 2020, llegaron a un entendido en que el DRD no realizaría las tareas a través de las empresas contratadas, sin la presencia de personal de ornato o de un agrónomo del Municipio. Las compañías contratadas por el DRD, sin embargo, incumplieron con dicho acuerdo, por lo que el Municipio paralizó las labores en el Parque Monagas en al menos una ocasión.

A tenor de los hechos probados, el TPI declaró ha lugar la *Demanda Enmendada* del grupo demandante y la *Demanda de Intervención* de CDK y concedió los siguientes remedios:

1) Se declaran nulos el Acuerdo Interagencial original y el nuevo Acuerdo Interagencial entre DRD y DRNA, en cuanto al Parque Monagas se refiere.

2) Se emite un *injunction* permanente prohibiendo a los demandados: (i) remover de material vegetativo; (ii) cortar árboles; y (iii) podar árboles en el Parque Mongas bajo el Acuerdo Interagencial original y el nuevo Acuerdo Interagencial entre DRD y DRNA.

3) Se emite un *injunction* permanente ordenando al Estado Libre Asociado de Puerto Rico a realizar un nuevo plan de mitigación por los trabajos ya realizados en el Parque Monagas, que sea cónsono con la legislación y reglamentación ambiental.

4) Se ordena al Estado Libre Asociado de Puerto Rico a preparar una Declaración de Impacto Ambiental, cuando vaya a realizar trabajos de corte y poda de árboles en el Parque Monagas.

Inconforme, el Estado instó una oportuna reconsideración en la que planteó nuevamente que el caso era académico.[20] Indicó que en el ínterin del tracto procesal, la controversia se extinguió y perdió justiciabilidad. El día 28 siguiente, el TPI expresó en su *Resolución* denegatoria:

> Atendida la moción de reconsideración presentada por el Estado Libre Asociado de Puerto Rico y sus agencias, se provee no ha lugar. El planteamiento sobre justiciabilidad fue previamente considerado por el Tribunal al denegar la moción de desestimación presentada por el Estado.

No conforme aún, el Estado instó el presente recurso de apelación el 29 de enero de 2024 y señaló la comisión de los siguientes errores:

> Erró el Tribunal de Primera Instancia al no desestimar la demanda por carecer de justiciabilidad, dado que la controversia se tornó totalmente académica.

> Erró el Tribunal de Primera Instancia al concluir que la denegatoria de la moción de desestimación interpuesta por el Estado —fundamentada en la academicidad de la causa— constituye "la ley del caso", porque el Estado no recurrió de esa determinación interlocutoria vía *certiorari* ante este Honorable Tribunal de Apelaciones.

> Erró el Tribunal de Primera Instancia al ordenarle a priori al Estado preparar una DIA antes de realizar en el futuro cualquier labor de corte y poda de árboles, emitiendo así una improcedente opinión consultiva e interfiriendo indebidamente con las funciones que fueron expresamente delegadas a otra rama gubernamental.

El 28 de febrero de 2024, la parte demandante presentó un escrito intitulado *Oposición a Apelación*. Con el beneficio de su comparecencia, resolvemos.

---

[20] Apéndice del recurso, págs. 3,731–3,744.

**II.**

**A.**

La jurisdicción de los tribunales queda determinada por la aplicación de diversas doctrinas que le dan vida al llamado principio de justiciabilidad. Este principio de limitación autoimpuesta emana del rol que corresponde al Poder Judicial como parte de la trilogía de poderes de nuestro sistema de gobierno. *Muns. Aguada y Aguadilla v. JCA*, 190 DPR 122, 131-132 (2014), que cita a *Lozada Sánchez et al. v. JCA*, 184 DPR 898, 917 (2012). Una de esas doctrinas es la de academicidad que, como corolario del principio de justiciabilidad, "nace del elemental principio de que los tribunales existen únicamente para resolver controversias genuinas surgidas entre partes opuestas que tienen interés real en obtener un remedio que haya de afectar sus relaciones jurídicas". *E.L.A. v. Aguayo*, 80 DPR 552, 558–559 (1958). Un caso académico es aquél que pretende obtener una determinación judicial en torno a una controversia inexistente, por lo que la sentencia que se dicte en su día no tendrá efectos prácticos. *Id.*, pág. 584. El propósito de este precepto es evitar el inadecuado uso de los recursos judiciales y evitar precedentes innecesarios. *Emp. Pur. Des., Inc. v. H.I.E.Tel.*, 150 DPR 924, 936 (2000), citado en *Super Asphalt v. AFI y otro*, 206 DPR 803, 815–816 (2021). Es decir, **si la controversia pierde vigencia, ya sea por cambios fácticos o jurídicos durante el trámite, en lugar de conceder un remedio, el tribunal sólo emitiría una opinión consultiva**. Por lo tanto, el tribunal debe abstenerse de resolver los méritos de la controversia que ha dejado de estar viva y presente. Véanse, *Lozada Sánchez et al. v. JCA, supra*, pág. 913; *Asoc. Fotoperiodistas v. Rivera Schatz*, 180 DPR 920, 931 (2011); *E.L.A. v. Aguayo, supra*, pág. 584.

En lo que concierne al caso del título, se sabe que la doctrina de academicidad tiene una serie de excepciones que permiten la

consideración de un caso que, de otro modo, resultaría académico en cuanto a su resultado o efecto inmediato. Esto es cuando:

> (1) se plantea ante el foro judicial una cuestión recurrente o susceptible de volver a ocurrir **y que tienda a evadir la revisión judicial**; (2) cuando la situación de hechos ha sido modificada por el demandado, pero el cambio no aparenta ser permanente, y (3) cuando se tornan académicos aspectos de la controversia, pero subsisten consecuencias colaterales vigentes. (Citas omitidas y énfasis nuestro). *Bhatia Gautier v. Gobernador*, 199 DPR 59, 73–74 (2017).

Al determinar si se configura la excepción de recurrencia, se deben considerar los siguientes factores: (1) la probabilidad de repetición de la controversia; (2) la identidad de las partes involucradas en el procedimiento;[21] y (3) **que el asunto evada la revisión judicial, porque resulte inherentemente de corta duración que sea probable que la controversia siempre se torne académica**. *Asoc. de Periodistas v. González*, 127 DPR 704, 721 (1991). El alto foro ha dispuesto que puede haber otras razones, además de la brevedad cronológica, que ocasionen que una controversia sea capaz de eludir la revisión judicial. Además, ha aseverado que la probabilidad de la recurrencia es el factor primario en el proceso de concluir si una determinación afirmativa de academicidad promoverá la finalidad de la economía o autolimitación judicial. *Id.* Por tanto, "[e]n aquellos casos donde exista la probabilidad de que la controversia se repita o recurra, los tribunales deben considerar el asunto planteado a pesar de que el mismo haya advenido académico". *Id.*

De otro lado, la cesación voluntaria sin visos de permanencia opera cuando "la terminación voluntaria de una conducta no tornará académica una controversia salvo que los eventos subsiguientes hagan absolutamente claro que no es razonable

---

[21] En *Com. de la Mujer v. Srio. de Justicia*, 109 DPR 715, 725 (1980), el Tribunal Supremo señaló que para que aplique la excepción del carácter recurrente no es necesario que, al repetirse la controversia, ésta afecte a las mismas partes. La norma fue reiterada en *Asoc. de Periodistas v. González*, 127 DPR 704, 723 (1991).

esperar que la alegada conducta impugnada vuelva a ocurrir". *U.P.R. v. Laborde Torres y otros I,* 180 DPR 253, 282–283 (2010). Consecuentemente, un caso es académico sólo si: "(1) puede asegurarse que la violación alegada no va a volver a ocurrir y (2) el remedio provisional concedido o los eventos acaecidos han erradicado completa e irrevocablemente los efectos de la violación alegada". *Id.*, pág. 283.

**B.**

En nuestro ordenamiento jurídico es norma asentada que **los derechos y las obligaciones adjudicados mediante un dictamen judicial, que adviene final y firme, constituyen ley del caso**. *Pérez v. Hatton Gotay y otros*, 195 DPR 1, 8 (2016); *Félix v. Las Haciendas*, 165 DPR 832, 843 (2005); *Mgmt. Adm. Servs. Corp. v. E.L.A.*, 152 DPR 599, 606 (2000); *Sánchez Rodríguez v. López Jiménez*, 118 DPR 701, 704 (1987). El alto foro ha expresado que esos derechos y obligaciones "gozan de finalidad y firmeza" para que las partes en un pleito puedan proceder "sobre unas directrices confiables y certeras". *Pérez v. Hatton Gotay y otros*, *supra*, págs. 8–9; *Mgmt. Adm. Servs. Corp. v. E.L.A.*, *supra*, págs. 607–608. Por consiguiente, "de ordinario, las controversias adjudicadas por el foro primario o por un tribunal apelativo no pueden rexaminarse". *Pérez v. Hatton Gotay y otros*, *supra*, pág. 9; *Mgmt. Adm. Servs. Corp. v. E.L.A.*, *supra*, pág. 607. Lo anterior aplica a las cuestiones finales consideradas y decididas por el tribunal. *Félix v. Las Haciendas*, *supra*, pág. 843. Tales determinaciones, como regla general, obligan tanto al tribunal de instancia como al que las dictó, si el caso vuelve ante su consideración. *Id.* Por lo tanto, el Tribunal Supremo ha afirmado que la doctrina sólo puede invocarse cuando existe una decisión final de la controversia en sus méritos. *Id.*

Ahora bien, el máximo foro ha aclarado que esta doctrina no es un mandato inflexible. *Pérez v. Hatton Gotay y otros*, *supra*, pág.

9; *Mgmt. Adm. Servs. Corp. v. ELA, supra,* pág. 607. Por ello, se ha reiterado que, en situaciones excepcionales, si el tribunal entiende que alguna determinación previa es errónea y puede causar una grave injusticia, entonces, el foro sentenciador puede aplicar una norma de derecho distinta. *Pérez v. Hatton Gotay y otros, supra,* pág. 9; *Félix v. Las Haciendas, supra,* pág. 844; *Mgmt Adm. Servs. Corp. v. E.L.A., supra,* pág. 608; *In re Tormos Blandino,* 135 DPR 573, 578 (1994); *U.S.I. Properties, Inc. v. Registrador,* 124 DPR 448 (1989). Es decir, cuando los principios básicos de la justicia están amenazados, es que los tribunales pueden descartar la doctrina de la ley del caso. *Pérez v. Hatton Gotay y otros, supra,* pág. 10; *Noriega v. Gobernador,* 130 DPR 919, 931 (1992); *Don Quixote Hotel v. Tribunal Superior,* 100 DPR 19, 30 (1971). Al fin y al cabo, la doctrina de la ley del caso "es una manifestación necesaria y conveniente del principio reconocido de que las adjudicaciones deben tener fin". *Srio. del Trabajo v. Tribunal Superior,* 95 DPR 136, 141 (1967).

## C.

Como se sabe, la preeminencia que tiene para nuestro país el uso adecuado y coherente de nuestros recursos naturales es un valor de entronque constitucional. Nuestra Carta Magna establece que "[s]erá política pública del Estado Libre Asociado la más eficaz conservación de sus recursos naturales, así como el mayor desarrollo y aprovechamiento de los mismos para el beneficio general de la comunidad". Art. VI, Sec. 19, Const. ELA, LPRA, Tomo 1, ed. 2023. A tales efectos, a través de una amplia legislación, a la que el apelante ha aludido en su recurso, se ha establecido la política pública dirigida a la protección de los recursos naturales. Por ello, cada ente adjudicativo debe estar consciente del ordenamiento legal y reglamentario, al momento de adoptar las decisiones que puedan afectar el medio ambiente.

La Asamblea Legislativa aprobó la Ley Núm. 416 de 22 de septiembre de 2004, *Ley Sobre Política Pública Ambiental*, 12 LPRA sec. 8001 *et seq.* Por virtud del estatuto, se aspira la obtención de objetivos, tales como: "(1) la más efectiva protección del ambiente y los recursos naturales; (2) el uso más prudente y eficiente de los recursos naturales para beneficio de toda la ciudadanía; (3) un progreso social que reconozca las necesidades de todos; y, (4) el logro y mantenimiento de altos y estables niveles de crecimiento económico y empleos". *Id.* Al palio de la referida legislación, la Junta de Calidad Ambiental promulgó el Reglamento Núm. 8858 de 23 de noviembre de 2016, *Reglamento para el proceso de evaluación ambiental*, el cual establece entre sus propósitos los siguientes:

REGLA 102 – PROPÓSITO

A. Este Reglamento tiene como propósito establecer un procedimiento ágil de planificación ambiental, donde todos los departamentos, agencias, municipios, corporaciones e instrumentalidades públicas del Estado Libre Asociado de Puerto Rico y sus subdivisiones políticas, antes de proponer legislación, efectuar cualquier acción o promulgar cualquier decisión gubernamental que afecte significativamente la calidad del medio ambiente, obtengan, consideren, evalúen y analicen toda la información necesaria para asegurar que se tomen en cuenta los factores e impactos ambientales, a corto y largo plazo, en todas y cada una de las decisiones que pudieran en una u otra forma afectar el ambiente, y que las determinaciones sobre tales impactos o efectos de los mismos en el medioambiente sean tomadas de manera informada.

B. El propósito de este reglamento es, además, establecer el procedimiento que regirá la preparación, evaluación y trámite de los documentos ambientales. La OGPe,[22] participará de este proceso desde el punto de vista de fiscalización, conduciendo un trámite investigativo que incluye la obtención de comentarios y recomendaciones de otras agencias gubernamentales y del público en general. La OGPe emitirá la determinación final de la acción propuesta, basado en toda la información obtenida y la adecuacidad del documento presentado.

C. El proceso de planificación ambiental es un procedimiento informal *sui generis* y garantiza el fiel cumplimiento con la Política Pública Ambiental de Puerto Rico, cuyo propósito es alentar y promover el

---

[22] Siglas de la Oficina General de Permisos.

bienestar general y asegurar que los sistemas naturales estén saludables, que tengan la capacidad de sostener la vida en todas sus formas, y crear y mantener las condiciones bajo las cuales el ser humano y la naturaleza puedan coexistir en armonía productiva.

La Regla 103, *Aplicabilidad*, del Reglamento Núm. 8858 establece que aplica "a todos los departamentos, agencias, municipios, corporaciones públicas y cuasi-públicas, entidades gubernamentales y sus sub-divisiones políticas, y a cualquier persona, natural o jurídica, grupo o entidad privada que tenga responsabilidad sobre cualquier acción contemplada en este Reglamento".

En lo que atañe al señalamiento de error planteado en el recurso que nos ocupa, la reglamentación define la *declaración de impacto ambiental* como el "**[d]ocumento de planificación en el cual la agencia proponente tiene la obligación de considerar y detallar por escrito todas las consecuencias ambientales significativas y previsibles vinculadas a la acción propuesta**". (Énfasis nuestro). Regla 113, Reglamento Núm. 8858. Asimismo, el documento reglamentario establece el deber de preparar una DIA "para toda acción que pueda tener un impacto significativo sobre el ambiente o para aquellas acciones listadas..." en el Capítulo V. Regla 121, Reglamento Núm. 8858. Entre las acciones que requieren de una DIA, la Regla 122 del Reglamento Núm. 8858 enumera, en parte, las siguientes:

A. Cualquier acción que pueda impactar significativamente el uso dado a los diferentes componentes del ambiente, tales como, pero sin limitarse a: una población biótica, un recurso natural, el ambiente estético o cultural, la calidad de vida, la salud pública, los recursos renovables o no renovables; o que pueda sacrificar los usos beneficiosos del ambiente a largo plazo a favor de los usos a corto plazo o viceversa;

.    .    .    .    .    .    .    .

C. Cualquier acción que pueda impactar significativamente un área donde existan recursos naturales o valores de importancia ecológica, recreativa, social, cultural;

D. **Una acción que pueda afectar adversamente alguna especie designada como vulnerable o en peligro de extinción, o su hábitat designado como crítico** bajo la Ley Núm. 241 del 15 de agosto de 1999, según enmendada, mejor conocida como "Nueva Ley de Vida Silvestre", 12 L.P.R.A. § 107 *et seq.*, o la Ley Federal conocida como *Endangered Species Act*, 16 U.S.C.S. § 1531 *et seq.*

.     .     .     .     .     .     .     .

J. La OGPe podrá requerir la preparación de una DIA para cualquier acción que a su juicio y por razón de sus particularidades determine que pueda tener un impacto ambiental significativo, a base de la totalidad de la acción propuesta, aunque la acción no esté expresamente incluida en esta Regla. (Énfasis nuestro).

Expuesto el derecho aplicable a las cuestiones planteadas, pasamos a resolverlas.

### III.

En el primer señalamiento de error del recurso que nos ocupa, el Estado plantea que el TPI incidió al no desestimar la *Demanda Enmendada* por tornarse académica. Afirma que el Estado **cesó de manera permanente el corte y poda de árboles en el Parque Monagas, así como que las tareas de rehabilitación, recogido de escombros y reforestación culminaron en su totalidad**. Sostiene que aun cuando la controversia sea susceptible de recurrir, no evadiría la revisión judicial.

Reproducimos a continuación parte de las expresiones del TPI en la *Resolución* de 8 de mayo de 2021, que lo indujeron a rechazar la academicidad de la controversia y a las que hemos impartido énfasis:[23]

.     .     .     .     .     .     .     .

Los recursos naturales, tales como los árboles, son irremplazables. Si bien es cierto que la reforestación no solamente es deseable sino que es requerida por la legislación local y federal, tampoco puede obviarse que ciertos árboles pueden demorar décadas en alcanzar su desarrollo. Según surge del expediente ante nos, el Parque Monagas no es cualquier facilidad recreativa, sino que contiene un bosque, es decir, un área con flora y fauna particular que también alberga especies protegidas por la legislación local y federal. Luego de

---

[23] Apéndice del recurso, págs. 3,464–3,465.

que el Estado o cualquier empresa contratada corta árboles, los poda o remueve, sería muy acomodaticio aducir que opera la doctrina de academicidad porque no hay más que cortar. En controversias ambientales aplica la frase de que "el daño está hecho". Si esa fuera la situación, el Tribunal no puede mirar hacia el otro lado porque hay actuaciones dañinas —no solamente en el aspecto ambiental, sino en otro tipo de litigios— que ocurren en un brevísimo periodo de tiempo. Precisamente una adjudicación en los méritos evita que la situación vuelva a repetirse y que se evada la revisión judicial.

Por otro lado, albergamos serias dudas en torno a la permanencia en la cesación de la conducta del Estado respecto a los trabajos en el Parque Monagas. Hemos examinado cuidadosamente el Acuerdo Interagencial 2021, comparándolo con el anterior y, aunque al presente se añadieron ciertos requisitos, como el requerir un permiso de corte y poda, los trabajos futuros a realizarse en el Parque Monagas se describen en término sumamente amplios en el Acuerdo Interagencial 2021, por lo que en términos sustantivos no encontramos diferencia comparándolo con el Acuerdo Interagencial anterior. La controversia entonces subsiste. Además, según los términos del Acuerdo Interagencial 2021, las actuaciones que alegadamente [*sic*] provocaron el daño ambiental en el Parque Monagas objeto de este pleito, sí pueden repetirse indistintamente de los aludidos permisos de corte y poda que se consideraron en esta ocasión durante el curso del pleito de autos.

No hallamos una situación que ejemplifique una mejor excepción a la doctrina de academicidad que la que ahora nos ocupa. En términos sucintos, la flora y la fauna se puede destruir en minutos u horas, pero para fines de la administración de la justicia lo medular es determinar qué ocurrió, si hubo una infracción al ordenamiento y evitar que algo semejante pueda repetirse. [...]

.        .        .        .        .        .        .        .

Asimismo, el TPI justipreció que, luego de la intervención de los apelados, el Estado adoptó acciones reactivas para cumplir con las leyes protectoras, como la suscripción de un nuevo acuerdo interagencial con el requerimiento de permisos de corte y poda. Reconoció que, al principio, se suspendieron las labores en el Parque Monagas de manera preliminar; pero posteriormente, las labores se paralizaron de forma permanente.

Ahora bien, en síntesis, el origen de este caso fue la expedición de un *injunction* para que se decretara la ilegalidad y se paralizara

en forma permanente la poda y el corte de árboles indiscriminado en el Parque Monagas, por virtud del primer acuerdo interagencial entre el DRNA y el DRD. Este documento permitió las labores sin sujeción al proceso formal de solicitud de permisos. Las partes apeladas e interventoras solicitaron también que se ordenara la preparación y ejecución de un plan de reforestación en el área. CDK, por su parte, requirió la preparación de una DIA, previo a llevar a cabo los trabajos bajo el primer acuerdo interagencial y que se realizara un plan de mitigación.

Un examen del expediente revela que desde al menos dos años antes de emitirse la *Sentencia*, el Estado dejó sin efecto el primer acuerdo interagencial, cuyo decreto de nulidad fue peticionado por la parte apelada. El 5 de marzo de 2021 el DRNA y el DRD otorgaron el segundo acuerdo interagencial, en el cual se sujetaron las actividades de corte y poda de árboles en todos los parques nacionales de Puerto Rico al cumplimiento de la reglamentación, que exige la solicitud de permisos al DRNA, según lo requerido por los apelados.

De igual modo, desde 2021, el Estado cesó de manera permanente el corte y la poda de árboles en el Parque Monagas. Así fue constatado por el TPI en su determinación de hecho 90 al expresar que "[e]l DRNA y el DRD han informado que las labores de manejo, tala y poda de árboles en áreas verdes, caminos y veredas, en el Parque Monagas no se reanudarán, por lo que se han dado por terminadas". El Estado ejecutó, además, labores de reforestación según contempladas en el *Plan de Siembra, Manejo y Mantenimiento del Parque Julio E. Monagas, Bayamón, P.R.* de octubre de 2020 y revisado en febrero de 2021.[24]

---

[24] Apéndice del recurso, págs. 3,302–3,325.

Es forzoso concluir que durante el trámite judicial la controversia entre los litigantes dejó de existir, por lo que la causa de acción no era justiciable al tiempo de notificarse el dictamen cuya revisión nos ocupa. En cuanto a las excepciones de la doctrina de academicidad, si bien podemos coincidir que con cada temporada de huracanes la controversia es susceptible de recurrir, somos del criterio que no cumple con el criterio de evadir la revisión judicial. Ciertamente, de repetirse la conducta *ultra vires* denunciada, los apelados u otras partes pueden acudir a cualquier foro administrativo o judicial en búsqueda de idénticos remedios a los solicitados cuando se inició el pleito en el 2020. En suma, por imperativos de justiciabilidad estamos compelidos a revocar la *Sentencia* impugnada.

Lo anterior está ligado al tercer señalamiento de error. En éste, el Estado alega que el TPI incidió al ordenar la preparación de una DIA, previo a realizar en el futuro cualquier labor de corte y poda de árboles en el Parque Monagas. Sostiene que interfiere indebidamente con las funciones delegadas a otra rama gubernamental. Le asiste la razón, toda vez que la causa de acción perdió su vigencia, el TPI realmente emitió una opinión consultiva y concedió un remedio a destiempo.

Ahora bien, huelga expresar que el mandato judicial no es necesario, ya que el ordenamiento jurídico contempla la medida profiláctica. Veamos.

En lo que concierne, el TPI consignó las siguientes determinaciones fácticas:[25]

.    .    .    .    .    .    .    .

8. El Parque Monagas es hábitat de la boa puertorriqueña y el palo de rosa (*ottoschulzia rhodozylon*).

9. La boa puertorriqueña es uno de los reptiles en peligro de extinción y tiene presencia en toda la Isla.

---

[25] Apéndice del recurso, pág. 3,689.

10. El palo de rosa es una de las especies (árbol) en peligro de extinción y tiene presencia en varios bosques de Puerto Rico, como en Guánica, Cabo Rojo, Zona del Carso Norte y Zona Este de Puerto Rico.

.    .    .    .    .    .    .    .    .

De conformidad con la regulación federal,[26] dondequiera que se encuentre (*Wherever found*), la *boa puertorriqueña* (*Epicrates inornatus*) está designada como una especie en peligro (*Endangered species*). Véase, Código de Regulaciones Federales, 50 CFR sec. 17.11 (h). Igualmente, dondequiera que se encuentre, la especie *palo de rosa* (*Ottoschulzia rhodoxylon*) está designada como una especie amenazada (*Threatened species*). Véase, Código de Regulaciones Federales, 50 CFR sec. 17.12 (h). Ambas especies se encuentran en el Parque Monagas, el cual es parte de la zona cárstica de Puerto Rico que, a su vez, está protegida al amparo de la Ley Núm. 292 de 21 de agosto de 1999, *Ley para la Protección y Conservación de la Fisiografía Cárs[t]ica de Puerto Rico*, 12 LPRA sec. 1151 *et seq*. El estatuto establece como política pública la protección, conservación y manejo de la fisiografía cárstica de la Isla, por "albergar una alta cantidad de especies de flora y fauna; almacenar enormes abastos de aguas subterráneas; poseer terrenos de excelente aptitud agrícola y guardar un enorme potencial recreativo y turístico atribuibles a sus cualidades naturales". *Id.*

En este caso, luego de ponderar el voluminoso expediente y aquilatar la prueba, el TPI coligó que el Parque Monagas se encuentra en la zona kárstica del norte de Puerto Rico y es hábitat crítico para al menos dos especies en peligro de extinción: el palo de rosa y la boa puertorriqueña. Del dictamen surge también que el Parque Monagas contiene múltiples especies de flora y fauna autóctonas y exóticas. A la par, el área se utiliza para fines

---

[26] Refiérase a *Endangered Species Act*, 93 P.L. 205, 87 Stat. 884. 16 USC 1531-1544

recreativos como el senderismo, la escalada, correr bicicleta e, incluso, se usa para la investigación científica.

Conforme lo anterior, según las leyes y reglamentos aplicables, nos parece claro el mandato de preparar una DIA cuando, de manera concreta, se pretende alterar el hábitat de las referidas especies protegidas. Así ya se dispone en el Reglamento Núm. 8858 para los casos en que una acción impacte significativa y adversamente una población biótica, un recurso natural; o un área donde existan recursos naturales o valores de importancia ecológica, recreativa; o a alguna especie designada como vulnerable o en peligro de extinción, incluyendo su hábitat. No obstante, el TPI incidió al emitir una orden prematura, que no se apoya en una controversia real y vigente. Por ende, reiteramos que, de recurrir la pugna entre los litigantes, por alguna violación al esquema legal de protección ambiental, la cuestión no evadiría la revisión judicial, pues las partes legitimadas podrán reproducir sus reclamaciones. En esta ocasión, debido a la intervención de los apelados, según el TPI consignó, sólo el 1% del área total del Parque Monagas fue impactado, pues se cortaron 1,864 árboles y se podaron 64.

Finalmente, en cuanto al segundo error, el Estado aduce que el TPI concluyó erróneamente que la denegación de la moción desestimatoria incoada de manera interlocutoria constituía "la ley del caso", toda vez que el apelante no recurrió ante este foro revisor dicha determinación.

En su *Sentencia*, el TPI expresó que el asunto de academicidad había sido, en efecto, adjudicado mediante la *Resolución* de 8 de mayo de 2021 y constituía la ley del caso. Mencionó que el dictamen no fue recurrido y, por ende, no tenía "nada nuevo que disponer". De entrada, rechazamos la interpretación que el apelante plantea en su premisa de error. El TPI no dispuso que el asunto ostentara finalidad y firmeza en su adjudicación, de manera que la decisión

obligara a este tribunal intermedio. Simplemente, aludió a que ya había considerado la contención en una ocasión anterior, tal como reseñamos en los hechos procesales. Por lo general, una controversia que ha sido adjudicada por el foro primario no se vuelve a examinar, con el fin de dar certeza y continuación a los procedimientos. Así, pues, entendemos que el apelante se equivoca al interpretar lo vertido en el dictamen. Incluso, de haber sido de otra forma, ello no impidió que el Estado formulara el planteamiento ante esta curia, según resuelto en los párrafos precedentes. No se cometió el segundo error.

## IV.

Por los fundamentos expuestos, revocamos la *Sentencia* apelada. En consecuencia, desestimamos, sin perjuicio, las causas de acción instadas por la parte demandante y apelada.

Lo acordó el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones